# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 73824-1-I |
| | ) | |
| JESSE FINKEN, | ) | |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| and | ) | |
| | ) | |
| BRIANNE FINKEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: March 13, 2017 |
| | ) | |

MANN, J. — Prior to trial in Jesse Finken's petition for dissolution, a court commissioner issued a temporary order allowing his wife, Brianne Sherman,[1] to relocate to Arizona with their only child. At trial, the court found grounds to restrict Sherman's residential time with the child, concluded that the child should reside the majority of the time with Finken, and awarded Finken a judgment for pretrial transportation costs. Sherman challenges all three rulings. We affirm.

## FACTS

Brianne Sherman and Jesse Finken married in 2008 and separated in 2012. They have a son, C.F., born in April 2011.

---

[1] Brianne Finken currently goes by Brianne Sherman.

In March 2013, Finken filed for dissolution. Shortly thereafter, Sherman filed a notice of intent to relocate C.F. to Arizona. Following a hearing, a court commissioner issued a temporary order granting Sherman's request to relocate with C.F. and awarded Finken 10 days of visitation per month in Washington. The order stated that "[e]ach party shall handle one half of the transportation of the child for the 10 day visits in Washington with the child." Sherman did not move to revise this order. See RCW 2.24.050.

In June 2015, the matter proceeded to trial with both parties testifying and calling witnesses. In its oral decision, the court applied the factors in RCW 26.09.187(3)[2] for determining which parent the child should reside with the majority of the time:

> I need to go through the statutory factors [in RCW 26.09.187(3)] that guide my decision. . . . The first factor and the most important is the

---

[2] RCW 26.09.187(3) provides:

(a) The court shall make residential provisions for each child which encourage each parent to maintain a loving, stable, and nurturing relationship with the child, consistent with the child's developmental level and the family's social and economic circumstances. The child's residential schedule shall be consistent with RCW 26.09.191. Where the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions as defined in *RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule, and shall make accommodations consistent with those schedules.

relative strength, nature, and stability of the child's relationship with each parent. Certainly I agree with the mother that this child has spent more time with the mother than with the father. Both parents have met the child's day-to-day needs when the child's been living with them, but the [child resided the majority of the time with the mother][3] for the first year or year and a half of the child's life. Since the parties' separation and particularly since the relocation to Arizona, the child has been spending about two-thirds of his time with the mother. That promotes a stronger relationship with the mother than the father and greater stability for the child.

That's not to say that each parent isn't fully capable of meeting the day-to-day needs and the other needs of this child in terms of the necessities of life and especially the intangibles: Love, affection, support, and proper parenting.

The second factor has to do with whether there are any agreements of the parties with respect to a Parenting Plan. Here there are none.

The third factor is the parents' potential, both past and future, for performing adequately the parenting functions, and including whether a parent has taken greater responsibility in meeting the daily needs of the child.

I think I've spoken to that in large measure. It ties inseparably with the first issue. The only question I have going forward, given the mother's disability and her dependence upon her fiancé to help meet her day-to-day needs financially, is whether in the future there will be the same measure or level of stability that this child has had with the mother in the past. I'm not going to speculate that it will change, but I certainly have questions given the mother's inability to work because of her health.

Certainly the father is physically able to provide for the child, and he has a good job waiting for him on Monday with a well-established company in this area.

The fourth factor has to do with the emotional needs and developmental level of the child. I've heard some evidence from both

_____

[3] The trial court's original decision referred to the "primary residential parent." Ch. 26.09 RCW does not recognize primary residential parents or secondary residential parents. Such short hand may be convenient, but unfortunately and inappropriately implies that one parent is more important than another. The Parenting Act of 1987 attempted to defeat such labelling implications by removing the designation of one parent as custodian and the other as visiting.

parents about how well the child does when he is with both the mother and with the father. And I've heard similar testimony to difficulties that the child has had in adjusting following or in anticipation of spending time with the other parent, whether it's a return home to the mother or travel to Washington to spend residential time with the dad. I haven't heard anything to delineate that this child, at age 4, needs to be with his mother or needs to be with his father over the other parent.

. . . .

The fifth factor is the child's relationship with siblings and other significant adults as well as the child's involvement with his physical surroundings, school, and other activities. This child is not in school. I don't question that he's actively involved with playmates in his environment in Arizona as much as he is involved with family and friends here in Washington and his surroundings here.

It's clear from the evidence that he has an extended family here in Washington area. He has aunts, uncles, cousins, grandparents on both sides of the family. And I'm willing to accept that if he stays in Arizona, he will have his maternal grandparents staying with him for a significant amount of time every year.

He obviously has a relationship with the mother's fiancé, Troy. I've heard nothing to indicate that he has a relationship with Troy's daughter, although she lives in the area. And I believe Troy's testimony was that he wanted to have a relationship with his daughter. It didn't sound as though there was a relationship that involved shared residential time such that this child has a relationship with Troy's daughter on the same plane as he has with his half sister, Makayla. That's a relationship that, commendably, the father has fostered and encouraged every time that he's had time to spend with Corbin here in Washington.

. . . .

So the fifth factor clearly indicates to me that there is a far greater extended family for the child here. I think he would be actively involved in school regardless of where he's living and actively involved with playmates and classmates regardless of where he's living. He doesn't have the same extended blood relationships in Arizona that he has here in Washington.

The sixth factor is the wishes of the parents and the wishes of the child if the child's old enough to express a view. This child is not. Both parents obviously would like [the child to reside with them the majority of the time].[4]

---

[4] See footnote 3.

The last factor is each parent's employment schedule and their ability to make accommodations consistent with those schedules. I think here each parent is fully capable and has demonstrated the ability to provide child care when they're working and to work around their work schedule such that their work schedule isn't going to be a detriment or interference with their ability to parent the child.[5]

The court then noted that the commissioner's temporary relocation ruling was necessarily subject to change when "the issue is a Parenting Plan." The court stated "[m]y task is to enter into a Parenting Plan that addresses the considerations that I've just reviewed and that is fundamentally . . . in the best interest of the child." The court proceeded to discuss the effect of moving C.F. from Arizona to Washington and limiting factors affecting placement under RCW 26.09.191:

I don't believe that it will be in the best interest of the child to remain in Arizona. The reasons for the relocation had to do with two factors, the mother's health and the mother's employment. It is still a good area for her. Her health needs are being addressed, but she's no longer working. She's not employable. I accept the testimony that she's disabled and hopefully will be awarded SSI benefits to reflect that disability. Her employment was one of the fundamental reasons that the mother was allowed to take the child out of his home state and to relocate to Arizona.

To the extent that the mother indicates that all of this talk of substance abuse . . . was addressed by and . . . resolved by the court commissioner belies one significant factor, and that is that after approving the relocation with the history of alcohol problems in the marriage, the mother, then, was pulled over for drunk driving six months after she relocated to Arizona.

Would the result have been any different if the court commissioner was prescient and could have anticipated that result? I suspect the decision would have been very different.

The other factor that is of great concern to me is that a Parenting Plan was entered . . . that . . . significantly recognized that the father was not going to be able to see his child on weekends and a midweek visit and

---

[5] (Emphasis added.)

things of that sort. So the effort was made to assure that the father would have the child for ten days every month and that the expenses for transportation would be shared between the parties. Notwithstanding the entry of that temporary plan, the mother chose not to follow that plan by dictating to the father that, if he wanted to see his son, that he would now have to pay all the transportation costs. If she believes that was necessary due to some change in circumstances, her appropriate remedy was to go back to court and ask for permission to change or modify the Parenting Plan.

. . . .

I will find that there are limiting factors, namely, a longstanding problem of alcohol abuse by the mother. I think when her own mother testifies that she has no problem, she just drinks to excess, and when the grandmother ignores or passes over history of being stopped three times for drunk driving and multiple police calls to the home because of intoxication on the part of Troy as well as herself, because she believes the child is O.K., she just has her head buried in the sand and is glossing over the significance of the problem and the impact that may have on this child.

. . . .

I will find that the mother is physically disabled based on her testimony and the documentary exhibits.

. . . .

I will enter a judgment in favor of the father for $2,506.55 for the unreimbursed transportation expenses that the mother was supposed to bear under the temporary Parenting Plan.

Given the limiting factors, I will provide that the father will have the decision-making authority on all nonemergency, major decisions: Education, healthcare, and religion.

. . . .

The other consideration that I've weighed. . . is . . . an attitude. . . that sadly reflects a willingness to exclude the father. That is not healthy for this child growing up.

Based on these reasons, the trial court provided that C.F. should live with Finken a majority of the time.

The court entered a parenting plan expressly incorporating its oral ruling.

Portions of that plan appear to conflict with each other and/or the incorporated oral ruling with respect to the court's grounds for restricting Sherman's residential time.

-6-

Paragraph 2.2 of the plan lists limiting factors supporting residential restrictions. In that paragraph, the court checked the box for "[a] long-term emotional or physical impairment which interferes with the performance of parenting functions as defined in RCW 26.09.004." Contrary to its incorporated oral ruling, however, the court did not check the box for "[a] long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions." Paragraph 2.2 also conflicts with paragraph 3.10 of the plan, which imposes restrictions based on the findings in paragraph 2.2. In that paragraph, the court referred only to Sherman's "long term impairment from her abuse of alcohol" and did not mention any long term emotional or physical impairment.

The court's child support order awarded Finken "a judgment against Brianne Finken in the amount of $2506.55 for [pretrial] long distance transportation costs."

Sherman appeals.

## ANALYSIS

### I

Trial courts have broad discretion in adopting a parenting plan and we generally review such plans for abuse of discretion. In re Marriage of Littlefield, 133 Wn.2d 39, 46, 51-52, 940 P.2d 1362 (1997); In re Marriage of Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). Appellate courts "are reluctant to disturb a child custody disposition because of the trial court's unique opportunity to personally observe the parties." In re Marriage of Murray, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981). "The emotional and financial interests affected by such decisions are best served by finality. The spouse

-7-

who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court." In re Marriage of Kim, 179 Wn. App. 232, 240, 317 P.3d 555 (2014).

We review findings of fact for substantial evidence. In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). We review conclusions of law to determine whether the findings of fact support the conclusions. In re Marriage of Myers, 123 Wn. App. 889, 893, 99 P.3d 398 (2004).

In addition, our review is also governed by Rules of Appellate Procedure (RAP) and substantive law that apply equally to litigants proceeding with counsel and those proceeding pro se. Westberg v. All-Purpose Structures, Inc., 86 Wn. App. 405, 411, 936 P.2d 1175 (1997) ("[P]ro se litigants are bound by the same rules of procedure and substantive law as attorneys."). Failure to comply with these rules may preclude appellate review. State v. Marintorres, 93 Wn. App. 442, 452, 969 P.2d 501 (1999) (declining to consider arguments where pro se brief did not comply with RAP); In re Estate of Hook, 193 Wn. App. 862, 873, 374 P.3d 215, review denied, 186 Wn.2d 1014, 380 P.3d 483 (2016) (declining to address discretionary review where parties did not discuss RAP 2.3(b)).

II

Sherman first challenges the finding in paragraph 2.2 of the parenting plan that her residential time should be limited under RCW 26.09.191(3)(b) due to "[a] long term emotional or physical impairment which interferes with the performance of parenting functions as defined in RCW 26.09.004." For the reasons stated below, we conclude

the challenged finding may be a clerical error, and in any event is not material to the court's residential decision.

RCW 26.09.191(3) identifies several long-term impairments warranting residential restrictions, including the following:

> (b) A long-term emotional or physical impairment which interferes with the parent's performance of parenting functions as defined in RCW 26.09.004.
>
> (c) A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions.

(Emphasis added.) Paragraph 2.2 of the parenting plan contains boilerplate language mirroring subsections (b) and (c):

> The . . . mother's involvement or conduct may have an adverse effect on the child's best interests because of the existence of the factors which follow:
>
> [X] A long-term emotional or physical impairment which interferes with the performance of parenting functions . . .;
>
> [ ] A long-term impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting functions.

The trial court checked the box for "A long-term emotional or physical impairment." Although the court did not check the box for "[a] long-term impairment resulting from drug, alcohol, or other substance abuse," it found in both its incorporated oral decision and paragraph 3.10 of the parenting plan that Sherman had such impairment.[6] The

---

[6] Paragraph 3.10, which imposed restrictions based on the limiting factors identified in paragraph 2.2, states in part:

> [T]he mother's residential time with the children shall be limited because there are limiting factors in paragraphs 2.1 and 2.2. The following restrictions shall apply when the child spends time with this parent:

court's failure to check the box for alcohol impairment in paragraph 2.2 was plainly inadvertent.

Whether the court intended to check the box for a long-term physical impairment is less clear. Evidence at trial demonstrated that Sherman has a physical disability that prevents her from working.[7] While the court found she had a disability in its oral decision, it did not clearly identify the disability as a limiting factor warranting residential restrictions. Nor did the court mention the disability in paragraph 3.10. In these circumstances, and given the proximity and similar wording of the alcohol impairment and physical impairment boxes in paragraph 2.2, it is possible that the court intended to check the alcohol impairment box but inadvertently checked the physical impairment box instead. It is also possible that the court intended to check both boxes but neglected to check the alcohol impairment box. In any case, we need not resolve that ambiguity.

---

> The Court finds that the mother has a long term impairment from her abuse of alcohol, and it is not in the best interest of the child to remain in Arizona. After relocating to Arizona, the mother had a DUI within 6 months of the relocation. She also had two previous DUI charges in Washington State. Additionally, from July 2014 and March 2015, there were four separate police incident reports involving her and/or her fiancé's (Troy Bailey's) intoxication from alcohol. Therefore, while the child is in her residential care, she shall not consume any alcohol nor shall she allow the child around anyone consuming alcohol, including Mr. Bailey.

We note that Sherman does not assign error to the findings in paragraph 3.10 or the court's incorporated oral finding identifying her alcohol issues as a limiting factor. We also note that Sherman admitted at trial that her current fiancée is an alcoholic and was intoxicated at the time of the police interventions in 2014 and 2015. In addition, Finken testified to Sherman's history of alcohol abuse, and Marie Axelson, who lived with Sherman in 2014, testified that Sherman "often" drank to the point of intoxication.

[7] Sherman testified that she suffered a "transient ischemic attack" that left her with speech and memory issues. She also has chronic migraines, chronic myofascial pain, and fibromyalgia.

Even assuming the court found Sherman's disability was a limiting factor, and further assuming that there was insufficient evidence to support that finding, we conclude the finding was not material to the court's decision. State v. Caldera, 66 Wn. App. 548, 551, 832 P.2d 139 (1992) (an erroneous finding of fact which does not materially affect the trial court's conclusions of law is not prejudicial). As noted above, paragraph 3.10 made no mention of Sherman's disability and imposed residential restrictions solely on the basis of Sherman's impairment due to alcohol abuse. While the court mentioned her disability in passing in its oral ruling, it is clear from that ruling that Sherman's alcohol problems, C.F.'s greater extended family in Washington, and Sherman's violations of the prior parenting plan were the principal factors in the court's decision to have C.F. reside with Finken a majority of the time. Accordingly, any deficiency in the challenged finding is immaterial and does not warrant relief.

### III

Sherman next contends the trial court "erred in applying the parenting plan factors in RCW 26.09.187 when relocation was at issue." She argues that the court should have applied the statutory relocation factors in RCW 26.09.520(4),[8] beginning

___

[8] RCW 26.09.520 lists the following relocation factors:
>   (1) [t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
>   (2) Prior agreements of the parties;
>   (3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
>   (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
>   (5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

-11-

"with the rebuttable presumption that the relocation was permitted" and requiring Finken "to prove that the detrimental effect of the relocation outweigh[ed] the benefit of the change to the child and the relocating person." This argument fails for several reasons.

First, Sherman did not raise this argument at trial. She states in her appellate brief that she "correctly identified the relocation issue and the statutory factors in her trial brief."[9] But she cites nothing in the record supporting this claim. While she did attach a list of 10 reasons for relocation to her initial notice of relocation, that list made no mention of RCW 26.09.520, the application of a rebuttable presumption, or the application of the relocation criteria to the residential schedule. In addition, the report of proceedings does not include closing arguments and contains no mention of the argument Sherman now raises on appeal. Because Sherman's argument was not preserved below, and because she offers no basis for reviewing it for the first time on appeal, we need not consider it. RAP 2.5(a).

Second, Sherman's focus on the relocation factors overlooks the fact that the trial court's focus was not on the commissioner's relocation decision, but on the residential schedule under the parenting plan. The court recognized that both parents wished to have C.F. reside with them a majority of the time and that it needed "to go through the

---

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;
(10) The financial impact and logistics of the relocation or its prevention.
[9] (Emphasis added.)

statutory factors that guide [that] decision." The court identified its "task" as creating "a Parenting Plan that addresses the considerations that I've just reviewed." Based on its review of the statutory factors, the court concluded that C.F. would reside with Finken a majority of the time. This decision rendered Sherman's relocation petition moot. See, In re Parentage of R.F.R., 122 Wn. App. 324, 328, 93 P.3d 951 (2004) (The parental relocation act governs the trial court's decision on whether the parent with whom the child resides a majority of the time to relocate his or her child); In re Marriage of Fahey, 164 Wn. App. 42, 262 P.3d 128 (2011); RCW 26.09.430 ("a person with whom the child resides a majority of the time shall notify every other person entitled to residential time or visitation . . . if the person intends to relocate.").

Third, Sherman's reliance on Kim is misplaced. The mother in that case filed for dissolution and relocation. Prior to trial, the court temporarily scheduled the children to reside with the mother a majority of the time. After trial, the court evidently retained the residential schedule but then granted her petition to relocate after considering the statutory relocation factors. In affirming, the appellate court ruled that the trial court properly applied the statutory relocation factors in deciding "the relocation issue." Kim, 179 Wn. App. at 243. Here, by contrast, the trial court reversed the temporary order determining that C.F. should reside with Sherman a majority of the time, thus rendering the relocation petition moot.

Fourth, Sherman provides no argument or authority supporting application of the statutory relocation factors when, as here, a court's residential plan will result in a child's relocation. RAP 10.3(a)(6) (appellate brief should contain supporting argument,

-13-

citations to legal authority, and references to relevant parts of the record); Am. Legion Post No. 32 v. City of Walla Walla, 116 Wn.2d 1, 7, 802 P.2d 784 (1991).

Last, the trial court did consider how changing the residential schedule, and thus relocating C.F. to Washington, would affect C.F. In fact, the court's oral ruling effectively covered all of the statutory relocation factors. Thus, even if the court were required to consider those factors in this setting, the trial court implicitly did so and remand for express consideration of the factors would be pointless.

Sherman argues in the alternative that even if the court was correct in using only the residential factors, the court "abused its discretion in applying them." She concedes that the court considered each of the factors and that it may have based its decision primarily on the limiting factors discussed above. She argues, however, that the limiting factor identified in paragraph 2.2 of the parenting plan—i.e., Sherman's physical impairment—is not supported by the evidence. For the reasons previously stated, that finding was not material to the court's residential schedule. Moreover, as we noted in footnote 6, Sherman has not assigned error to the court's finding in paragraph 3.10 and the incorporated oral decision that she "has a long term impairment from her abuse of alcohol, and it is not in the best interest of the child to remain in Arizona." The court did not abuse its discretion in establishing the residential schedule.

IV

Finally, Sherman challenges the court's judgment in favor of Finken for $2506.55 in pretrial long distance transportation costs. This judgment was for "unreimbursed transportation expenses that the mother was supposed to bear under the temporary

[pretrial order]." The temporary pretrial order stated that "[e]ach party shall handle one half of the transportation of the child for the 10 day visits in Washington with the child."

Sherman contends the commissioner's order violated RCW 26.19.080(3), which states in part that long-distance transportation costs for visitation purposes "shall be shared by the parents in the same proportion as the basic child support obligation." She also contends the commissioner "should have divided the [pretrial] long-distance transportation costs according to the parties' agreement." But Sherman did not raise these arguments before the commissioner and did not seek revision of the commissioner's order.[10] Absent a motion to revise, the order became a final order of the superior court subject to review only by this court. RCW 2.24.050; State v. Mollichi, 132 Wn.2d 80, 93, 936 P.2d 408 (1997). Because Sherman's arguments on appeal were not raised before the commissioner, and because she offers no basis to raise them for the first time on appeal, we decline to consider them. RAP 2.5(a).

Affirmed.

WE CONCUR:

---

[10] In fact, the parenting plan Sherman proposed to the commissioner stated that "[t]he father will pay for all flights to see the child" and made no mention of RCW 26.19.090(3). (Emphasis added.)

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2017 MAR 13 AM 9: 3